IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 6, 2009 Session

**STATE OF TENNESSEE  v. DARRELL ANDERSON**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 06-08794     Lee V. Coffee, Judge**

---

**No. W2008-00188-CCA-R3-CD  - Filed April 9, 2010**

---

Defendant-Appellant, Darrell Anderson, was convicted by a Shelby County jury of first degree premeditated murder and sentenced to life.  In this appeal, he presents the following issues for our review:  (1) whether the evidence was sufficient to support his conviction; (2) whether the trial court erred in giving a description of photographs that were not in evidence in response to a jury question; (3) whether the trial court erred in denying him an opportunity to make an offer of proof regarding the truthfulness of an officer's testimony; (4) whether the trial court erred in making comments in the presence of the jury which were unfairly prejudicial; (5) whether the trial court erred in excluding certain evidence; (6) whether he was unfairly prejudiced by the conduct of the State; (7) whether the trial court erred in qualifying an expert and admitting his conclusions; and (8) whether the trial court erred in failing to instruct the jury on the State's duty to preserve evidence.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and J. C. MCLIN, JJ., joined.

Paul J. Springer, Memphis, Tennessee, for the Defendant-Appellant, Darrell Anderson.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; William L. Gibbons, District Attorney General; and Damon K. Griffin, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**FACTUAL BACKGROUND**

On June 29, 2006, the victim, Renee Godwin, was struck by a vehicle, dragged over 800 feet, and tragically killed. Anderson was identified by witnesses as the driver of the vehicle that struck the victim. He was charged with first degree premeditated murder, and the following evidence was presented at trial.

**Trial.** Mary Louise Godwin, the victim's mother, testified that the victim had lived in Orange Mound, a community in Memphis, all of her life. She identified a photograph of the victim prior to her death. She further identified the victim's personal effects, including her shoes and a hair comb, from photographs taken at the crime scene.

Robert Thomas testified that he was sitting on his front porch located at the corner of Raymond Street and Select Avenue on the morning of the offense. He observed a vehicle "[come] through with something under it" but could not identify what it was. He "heard [the vehicle] hit the fence in the back behind [him,] and then [the vehicle] shot past." From exhibit 4, a diagram of the area, Thomas explained that "[the vehicle] came up Select [Avenue] and jumped off, just literally jumped Raymond [Street]." Thomas further stated that a few minutes prior to hearing the vehicle come down the street, he heard "[j]ust [a] bang, just hitting it. You could tell it hit something back there."

Phyllis Washington testified that she had gone to school with the victim and had known her for twenty to thirty years. Ms. Washington resided "[a]pproximately eight to ten houses down" from where the victim's body was found. On the day of the offense, Ms. Washington was returning from a job interview and saw the victim's body in the middle of the street. She stated that she immediately recognized that it was the victim in the street. Ms. Washington said the body was "like . . . a mangled dog [that] had been [run] over." When she was shown a photograph of the victim prior to her death, Ms. Washington confirmed that the body lying in the street was the victim, Renee Godwin. The last time Ms. Washington had seen the victim was "some days" prior to the offense.

Although Ms. Washington knew Anderson from the neighborhood, as well as from having conversations with him, she only knew him by the name "Big Bundy." Ms. Washington spoke with the police on the night of the offense and identified a photograph, admitted as exhibit 7, as the person she knew as "Big Bundy." She explained that her brother, son, mother, and another disabled brother lived with her in Orange Mound. She said she had previously seen the victim in the neighborhood with Anderson "several times." However, when asked if they were in a relationship, Ms. Washington replied, "Well, it was known, you know, said that they were boyfriend and girlfriend or whatever you want to call it, but I didn't know . . . ." At that point, defense counsel objected, and Washington clarified that she had seen the victim and Anderson together in the neighborhood "a year or so" before the offense occurred. Ms. Washington stated that she did not know Ray Stevenson or Bernard Brown.

Earnest Scruggs testified that he lived on Grand Street in Orange Mound. Between 10:30 and 11:30 a.m. on the date of the offense, Scruggs was standing on his front porch and heard an unusual noise. He said it was "[l]ike a person was driving a car and ran over a piece of cardboard and scrubbing like [sic] [.]" He continued to hear the same sound as the vehicle approached Grand Street. When the vehicle turned left onto Grand Street, Scruggs observed "two legs d[a]ngling from underneath the car." He attempted to stop the vehicle, but the vehicle turned too quickly. Scruggs said he was "about 15, 20 feet" from the vehicle and saw the driver "from his shoulders up." He described the driver as a "big guy" with "bushy [hair] like Jimmy Hendrix, somebody back in the day." Scruggs further testified that the vehicle "stopped before it got to the other stop sign down at Deadrick [Street,] and that's when he backed over the body and ran over her and kept going[.]" Specifically, Scruggs said "[the driver] went in reverse and ran over [the body] and put it back in drive and ran back over her." Scruggs said the driver then sped off.

Later that night, Scruggs provided a statement to the police. Scruggs identified Anderson as the driver of the vehicle the day after the offense, at the preliminary hearing, and at trial. Scruggs explained that Anderson's appearance in court was different than his appearance on the day of the offense. He said that Anderson's hair on the day of the offense was bushy and all over his head. Scruggs identified a Memphis Police Department Advice to Witness Viewing Photographic Display form, exhibit 10, which was shown to him the day after the offense. He confirmed that he signed and dated it. He also identified a photographic display, exhibit 11, containing six photographs, including Anderson, that was shown to him on the day after the offense. From the photographic display, Scruggs circled a photograph of Anderson, wrote "this is the man I saw driving the car with the victim underneath," and signed the document. He also identified Anderson at the preliminary hearing.

Louis Washington, a lifelong resident of the Orange Mound community, also lived on Grand Street with his sister, Phyllis Washington. He had known the victim from the neighborhood for about fifteen years. A little after eleven o'clock on the morning of the offense, Mr. Washington was walking up on his porch and heard someone say, "[There is] a body under that car." Mr. Washington ran into the street to investigate and explained:

> The way the car was coming, it was coming from like my right off of Select [Avenue]. So I ran out there and I looked at this person in the face and I heard the scrubbing under the car. So I ran behind the car and I went on down the street. So the car backed up –
>
> . . . .

-3-

It backed up like it was trying to get whatever it was away from up under the car and then it backed up and then it ran back over and went on down the street . . . .

Mr. Washington testified that he was running behind the car in an attempt to get the tag number, and when he got three to four feet away from the driver of the car, he was able to see the driver's face. He also said the vehicle that he observed was gray in color. Mr. Washington identified Anderson as the driver of the vehicle at trial. He explained, however, that on the day of the offense Anderson's hair was all over his head. Mr. Washington said there was nothing in the road that would have prevented the driver from going around the victim's body when he reversed the vehicle and ran over the victim's body again. He confirmed that his sister, Phyllis Washington, came to the scene shortly after he saw the driver of the vehicle. As he was describing the driver to his sister and her friends, they explained that he was describing who they knew as "Big Bundy."

Mr. Washington was taken to the homicide office at 201 Poplar the afternoon of the offense, along with Earnest Scruggs and Willie Minor. Mr. Washington stated that he spoke with the police officers alone and that the officers took his statement and showed him a photographic display. Within two or three minutes, Mr. Washington identified Anderson as the driver of the vehicle that dragged the victim's body. The photographic display was later admitted into evidence as exhibits 16 and 17. He confirmed that no other witnesses were present with him when he identified Anderson from the photographic display.

Mr. Washington conceded that he had a criminal history consisting of both felonies and misdemeanors dating back to the 1980's. He also testified that the last time he saw the victim alive was a month prior to the offense. Mr. Washington admitted on cross-examination that he could not read well and that he needed to have his statement read to him to ensure its accuracy. He also said that when he observed the vehicle, it was traveling "about 10 or 15 miles per hour."

Troy Brown, a Code Enforcement Officer for the City of Memphis, testified that he was assigned to the Orange Mound area on the date of the offense. Sometime after eleven o'clock that morning, Brown was working in the area of Grand and Ethel Streets between Park and Deadrick when he was approached by several people who were frantically screaming, "[D]ude ran over the lady and she's [lying] down there in the street." Brown flagged down another police officer, who followed him to the crime scene.

Memphis Police Officer Latonya West testified that she was patrolling the Orange Mound area between 11:15 and 11:30 a.m. on the day of the offense and assisted Officer Brown with the victim's body found in the street on Grand Avenue. Officer West described the body in the street: "One of her arms was almost detached from the body, mangled, like

over her head. She had lost a tremendous amount of skin off of her body and there were ragged pieces of clothing remaining on her body." Officer West, along with other officers, interviewed the people standing on the street to determine what they had seen and secured the crime scene to prevent evidence tampering.

Over the defense's objection, Sergeant Jimmy White testified as an expert in the area of traffic and accident reconstruction. On the day of the offense, Sergeant White and two other investigators were called to the scene on Grand Avenue where the victim had been struck by an automobile, which caused her fatal injuries. They noticed a liquid trail substance leading up to the victim's body, and they followed the trail in reverse to determine its origin. Sergeant White determined the point of impact or "origination" occurred on Select Street because of "the particular scuff mark and the trail of debris and the fluids stopped at the same point and there [were] other items at that point like shoes, I think it was like jewelry, a bag, and I think even a pop bottle that had all – all of that was scattered in the area . . . where the scuff mark and grease mark stopped." He said these items looked as if they belonged to the victim based on his experience:

> [I]n previous investigations where pedestrians have been struck, and not all of them are fatal, but in these investigations we have found that anything that's not permanently or semi[-]permanently attached to the body will be lost during the initial contact. There could be shoes, hats, wigs, some jewelry, sometimes handbags that may be held in their hand because of the violent force of initial impact usually it shakes anything not permanently attached loose.

He further stated that it is common for a pedestrian to be knocked out of their shoes upon initial impact. Sergeant White said that he and the other investigators surveyed the area surrounding the point of impact and noticed there were two acceleration marks, two to three feet in length, just west of where they found the victim's shoes. Sergeant White explained that after the victim was struck by the vehicle, her "body would elevate . . . depending on the speed of the car, it could either land on the car and roll back . . . [or] the body could go to the side off the hood or it could go over the car and land on the top of the car and roll off to the back . . . it could fall off either side or straight in the back depending on the angle it was struck." Sergeant White further opined that the victim's body was lodged underneath the vehicle, and the driver of that vehicle put the car back in forward gear and went westbound on Select Street and then southbound on Grand Avenue with the body still lodged underneath the vehicle's undercarriage. He said the scuff marks on the road were the result of the victim's body preventing one of the tires from rotating.

Sergeant White further described the initial impact:

[I]f you can imagine an imaginary line through your mid[-]section as an axis, as a body is struck, a person that's upright is struck at the bottom, your lower extremities will move forward, at the same time your upper extremities rotate backwards causing you to fall on the hood or windshield area of the car. The aerodynamic structure of cars kind of leans . . . from the nose of the car upwards which would elevate the body as the car passes below it, lifting the body in the air, leaving it to fall behind the car after it's cleared. So at that point the body is behind the car.

On cross-examination, Sergeant White acknowledged that he did not examine the vehicle involved in this case.

Sergeant Russell Maness of the Memphis Police Department Homicide Division testified that he responded to the crime scene on the day of the offense. He spoke with two of the witnesses who saw the driver of the vehicle. He confirmed that while two of the witnesses were giving him a description of the driver, Phyllis Washington walked up and said, "[T]hat sounds like 'Big Bundy.'" After several hours, Sergeant Maness left the crime scene and returned to the homicide office. He reviewed old booking photographs of Anderson, which he later took to Phyllis Washington, who confirmed that the individual in the photographs was "Big Bundy." He then created a photographic display of six similar looking individuals, including Anderson.

Sergeant Maness approached Anderson on the evening of the offense, and Anderson volunteered that "he couldn't of [sic] killed anybody because he doesn't have a car. . . [and] was not in the neighborhood where that occurred that day[.]" Sergeant Maness explained that this was significant because he "had not said anything about a car and . . . had not said anything about what neighborhood [they] were [in] – ." Anderson also told him that he had gone to get his hair done at a beauty shop located at Watkins and Brown the day of the offense.

On cross-examination, Sergeant Maness stated that there may have been more than one person with the nickname "Big Bundy"; however, he was not assigned to research that issue. When Sergeant Maness was asked whether he spoke to Roy Stevenson as part of his investigation, he replied, "I don't know. I may have – " The State then objected and, after a lengthy exchange, the trial court sustained the objection.

Sergeant Anthony Mullins testified that he participated in the investigation by interviewing the three witnesses from the crime scene at the homicide office. Sergeant Mullins stated that each witness was taken to a different room and interviewed separately. There were no photospreads shown to the witnesses at this point because the police did not have a suspect. Sergeant Mullins said that, based on the witnesses' descriptions, they only

had a possible nickname of "Big something" or maybe "Bundy." Sergeant Mullins recalled that there were two people, Anderson and someone named "Robinson", that had the nickname or a combination of the nickname. Sergeant Mullins testified that the other individual did not match the physical description provided by the witnesses.

Sergeant Mullins further testified that he encountered Anderson sitting on the steps outside of his mother's apartment complex on the day of the offense. He stated that Anderson's appearance on the day of the offense was different than his appearance in his last booking photograph. In the booking photograph, Anderson had "kind of [a] frizzed out Afro[.]" However, when Sergeant Mullins approached him outside his mother's apartment complex the day of the offense, Anderson's hair appeared to have "just been permed." Sergeant Mullins told Anderson that they were "investigating something that happened to a girl named Renee" and wanted to know if Anderson knew Renee. Anderson stated that he knew "a couple of Renees" and asked what happened. Sergeant Mullins told Anderson that Renee had been killed that day, and Anderson replied, "I've got an alibi for where I was." Anderson told the officers that he had been at the beauty shop, gave them the phone number to the shop, and told them the name of the person who was with him at the shop. After speaking with the person identified by Anderson, Sergeant Mullins determined that he had more questions for Anderson.

During the course of the conversation, Anderson told Sergeant Mullins that "he was not even in Orange Mound then, how could he have done anything." Sergeant Mullins testified that, at this point, they had not told Anderson where the crime occurred. Anderson continued and told the officers that he was "in north Memphis" and then asked, "How could I have done anything in Orange Mound?" Sergeant Mullins asked Anderson "why he would say something like that" because they never said anything about Orange Mound. Sergeant Mullins testified that Anderson "really didn't have a response to that." Anderson also told Sergeant Mullins, "I don't even have [a] car, how could I hurt somebody." Sergeant Mullins thought this was suspicious and asked Anderson, "[W]hat does a car have to do with it[?]" Anderson replied, "if you're going to kill somebody they either got to come to you or you've got to go to them and I don't have a car to get to anybody."

Anderson was taken into custody on an unrelated matter and transported to the Homicide Office at 201 Poplar. Sergeant Mullins explained that other aspects of the investigations were completed. Specifically, Sergeants Maness and Mason showed a single photograph of Anderson to Phyllis Washington, who confirmed that was who she was referring to as "Big Bundy." After some time had passed, they ultimately returned to the Orange Mound area with a photospread containing Anderson's photograph. Sergeant Mullins explained the procedure for showing witnesses a photospread and confirmed that Louis Washington identified Anderson as the driver of the vehicle from the photospread. On cross-examination, Sergeant Mullins testified that he viewed a photograph of Mr. Robinson,

the other individual with the "Bundy" nickname; however, he "[could not] say . . . for certain that there was [a photo spread] of Mr. Robinson."

Sergeant Mullins further testified that he searched for the subject vehicle as part of the investigation. He stated

> We did find one car that physically kind of met the description, but upon examination there was no evidence that was consistent with the incident that occurred....There was no blood, there was no hair, no clothing underneath the car. The damage actually wasn't consistent with what the accident – traffic investigation revealed.

Sergeant Mullins explained that the vehicle had been left on Winchester Road with two flat tires by the owner for two days. The vehicle was towed to the Crime Scene Office to be examined and was later released to the owner. The owner of the vehicle, an African American female, was married with one son. Sergeant Mullins determined that neither the owner's husband nor her son matched the description of the suspect. Sergeant Mullins acknowledged on cross examination that he searched Anderson's and his mother's driver's history and did not find any vehicle matching the description of the subject vehicle.

Dr. Karen Elizabeth Chancellor, the Chief Shelby County Medical Examiner, testified that she performed an autopsy examination of the victim's body. During the external examination, Dr. Chancellor observed "numerous injuries that were unfortunately very obviously outside of the body." The victim's entire face was "abraded or scraped." The victim also had "lacerations which are tears of the skin due to a blunt force injury." Dr. Chancellor summarized the victim's injuries:

> [O]n the left side of the [victim's] head there was a prominent oval area of circular scraping injury. . . . Above the ear and above the temple area on the side of her head. It measured 6 inches by four and a quarter inches and it was a scraping away of not only the skin but the bone so that the brain was actually exposed in this area. The area of scraping was flat. It was in one plane as if the head had been scraped along a surface for enough length of time to scrape that bone away. . . . And the abrasion within the buttocks had a black discoloration suggestive of what one might get from asphalt from a street. The backs of both hands were scraped. In particular the worst area on the extremities was the back of the right hand. And this area had a similar scraping injury to what I described on the head. Not only the skin and muscle were scraped away but part of the bone on the upper part of the right hand had been scraped away. And this was also in a flat plane such as one might get from being dragged along a rough surface.

Dr. Chancellor further stated that "parts of the bowel, the intestines, were exposed on the outside of the body." The victim's left ankle was fractured and the bone exposed. The victim also had multiple rib fractures on both sides of her body and a complete fracture of the thorax spine, the part of the back bone that is just below the neck. Dr. Chancellor stated that this part of the victim's back was completely broken and exposed. The victim also had lacerations of the liver and the spleen, multiple fractures of the pelvic bone, and a rupture of the urinary bladder. Dr. Chancellor further said that during the autopsy she found cocaine and "breakdown products" of cocaine in the victim's blood. She also stated that the victim's liver tissue also contained diphenhydramine, which is an antihistamine that can be bought over the counter. Dr. Chancellor concluded that the victim's cause of death was "multiple blunt force injuries[,]" which were the result of "being struck by a motor vehicle and dragged for some distance on the road."

Jary Rhodes, the first defense witness, testified that he dated Anderson's sister ten years prior to the offense. Rhodes explained that he remembered seeing Anderson on the date of the offense:

> I'm right next door to this beauty shop he go to and I got a thrift store back there, right. So every time I see him, you know, I ask about his sister, you know, I ask about his sister. Just so happened that morning I seen him and I asked him about his sister, you know, and he was, you know. . . just telling me he hadn't heard from her or whatever, you know, and that was, you know, it was that, you know.

Rhodes stated that he owned the above mentioned thrift store and recalled seeing Anderson "between 11:30 and twelve" the morning of the offense because that is when he opened the thrift store. On cross-examination, Rhodes conceded that he did not remember the date of the offense and that the "lawyer told him the day." Rhodes also acknowledged his extensive criminal history.

JoAnn Lewis, the owner of Diamond's Hair Gallery, testified that Anderson was one of her clients. She recalled the date of the offense because her son-in-law was sick in the hospital, and she received a call from Anderson just before she went into the building to visit her son-in-law. On the day of the offense, between 12:30 and 1:00 p.m., Anderson called Lewis to get her daughter's telephone number. She stated that Anderson called her from her the beauty shop because the shop's telephone number appeared on her caller identification. Anderson called her to talk about "jobs." Lewis returned to her shop "[a]bout two, maybe 2:15." When she returned to the shop, Anderson was sitting in a chair getting his hair done. She explained that Patricia Mims was Anderson's "operator." Lewis then engaged in "beauty shop talk" with Anderson. During cross-examination, Lewis stated she did not know the time of Anderson's arrival at the shop that day.

Georgia Scruggs, Anderson's mother, testified that he was living with her on the day of the offense. She recalled the day of the offense because her "whole world came tumbling down." She explained that she had a doctor's appointment that morning and "looked in at" Anderson before she left home "about 9:30." She testified that he was asleep on the floor when she left. While at the doctor's office, Anderson called her from home. She stated she left the doctor's office at 11:15 and returned home "about 11:35 or 11:40 [a.m.]." She then drove Anderson to Diamonds Beauty Shop. She stated that they arrived "about 11:50, 11:55 [a.m.] at the most." Scruggs stated that she drove a 2003 Grand Am that was champagne in color but explained that Anderson did not have a vehicle.

On cross-examination, Scruggs acknowledged that she had previously given Sergeant Mason a statement in which she omitted the time that she "dropped [Anderson] off at the beauty shop." In the statement, she said that "she [could not] give an approximate time." She also did not mention in her statement that Anderson had called her from home while she was at the doctor's office.

Based on the above proof, the jury convicted Anderson as charged.

As an initial matter, the State argues this appeal should be dismissed because the notice of appeal was untimely. Rule 4(a) of the Tennessee Rules of Appellate Procedure states that "in all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." However, waiver is not automatic and should only occur when "the interest of justice" mandates waiver. See, e.g., State v. Robert William Rockwell, No. E2006-01717-CCA-R3-CD, 2007 WL 2297817, at *2 (Tenn. Crim. App., at Knoxville, Aug. 13, 2007). In this case, the trial court denied Anderson's motion for new trial on December 13, 2007, and his notice of appeal was filed on January 15, 2008. Although the State correctly notes that Anderson had until Monday, January 14, 2008, to file his notice of appeal, the "interest of justice" is best served by granting a waiver in this case. See Tenn. R. App. P. 4(a); see also Crittenden v. State, 978 S.W.2d 929, 932 (Tenn. 1998).

**I. Sufficiency of the Evidence.** Anderson argues the evidence is insufficient to support his conviction for first degree premeditated murder. He specifically claims that the State failed to prove "that the victim was alive at the time she was hit by the vehicle" and "that the victim was run over intentionally." In response, the State contends that it presented sufficient evidence at trial for the jury to find Anderson guilty of first degree murder. We agree with the State.

When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)), perm. to appeal denied (Tenn. Nov. 13, 1990). The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence." Matthews, 805 S.W.2d at 779 (citation omitted). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997) (citation omitted). A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1) (2003). Premeditation is defined as "an act done after the exercise of reflection and judgment." Id. § 39-13-202(d). This section further defines premeditation:

> Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d). "'Premeditation' is the process of thinking about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 540-41 (Tenn. 1992) (quoting C. Torcia, Wharton's Criminal Law § 140 (14th ed. 1979)).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Rosa, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999) (citing Brown, 836 S.W.2d at 539), perm. to appeal denied (Tenn. June 14, 1999). "[T]he use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing" may support the existence of premeditation.

Bland, 958 S.W.2d at 660 (citing Brown, 836 S.W.2d at 541-42; State v. West, 844 S.W.2d 144, 148 (Tenn. 1992)). This Court has also noted that the jury may infer premeditation from any planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (citation omitted), perm. to appeal denied (Tenn. July 10, 1995).

First, Anderson contends there was no evidence showing that the victim was struck by the vehicle or that she was alive prior to the accident. We disagree. The victim's mother identified a photograph of the victim prior to her death. She testified that the victim lived in Orange Mound, the area in which her body was found on the day of the offense. The victim's mother also identified the victim's shoes and hair comb from photographs taken at the crime scene. Phyllis Washington also testified that she saw the victim "some days" prior to the offense. Finally, there was ample testimony from witnesses at the crime scene who identified the victim's body on the ground. There was more than sufficient proof presented to show that the victim was struck by the vehicle and was alive prior to the offense.

Second, Anderson focuses on inconsistencies in the testimony of several witnesses and argues that he was not sufficiently identified as the driver of the vehicle. Anderson further argues in this section, as well as section VIII of his brief, that Sergeant Mullins found a vehicle that "almost perfectly fit the description of the murder weapon" but decided to do a visual inspection rather than a chemical or forensic analysis of the vehicle before releasing it back to its owner. Anderson also claims that several alibi witnesses established that he could not have committed the crime. Each of these arguments was presented to and rejected by the jury. As previously stated, the trier of fact evaluates the credibility of the witnesses, determines the weight given to witnesses' testimony, and reconciles all conflicts in the evidence. Odom, 928 S.W.2d at 23. Furthermore, this court shall not "reweigh or reevaluate the evidence." Id. The proof in this case, established through two eyewitnesses, showed that Anderson struck the victim while driving a vehicle, and subsequently ran over the victim's body again. Viewed in a light most favorable to the State, we conclude that the evidence is sufficient to sustain Anderson's conviction for first degree premeditated murder. Anderson is not entitled to relief on this issue.

**II. Trial Court's Response to Jury Question.** Anderson argues that "the court erred by giving a description of photographs that were not in evidence in response to a jury question." Rather than instructing the jury to consider the proof as it was presented, which was the agreed upon procedure in the preceding bench conference, Anderson contends that the trial court "went into a long discussion about the legal basis for why the jury could not view the photographs." In doing so, Anderson claims the trial court improperly characterized the photographs in a manner "which inflamed an already sensitive jury." In response, the State argues that the trial court's comments were not improper.

When responding to questions propounded by a jury during deliberations, the trial court is required to "recall the jury, counsel, the defendant(s), and the court reporter back into open court and to take the matter up on the record." State v. Mays, 677 S.W.2d 476, 479 (Tenn. Crim. App. 1984) (citing the ABA Standards Relating to Trial by Jury § 5.3(a), ABA Standards Relating to the Function of the Trial Judge §§ 5.11(b), 5.12(a)). The failure to follow the proper procedure, however, is subject to harmless error analysis. State v. Tune, 872 S.W.2d 922, 929 (Tenn. Crim. App. 1993) (citations omitted), perm. to appeal denied (Tenn. July 6, 1993), perm. to rehear denied (Tenn. Aug. 23, 1993). If the defendant has not been prejudiced by an inappropriate response, reversal is not required. Id.

Following the testimony of the medical examiner and the close of the State's case in chief, the trial court received a question from the jury. The trial court held a bench conference and advised counsel that he would tell the jury, "I cannot answer that question . . . if it's not in the proof. But I will just reread that, that during the course of the trial you will receive all of the evidence you may properly consider to decide the case." The prosecutor then advised the court that "there is not one legal argument that we can make that could overcome the prejudicial effect and make [the pictures] more probative than prejudicial[,] which is why [the pictures] [are] all down in my office."

Here, Anderson does not dispute that the trial court followed the appropriate procedure for responding to jury questions presented to the court. He is aggrieved, however, because the trial court, in denying the jury's request for photographs of the victim's body at the crime scene, made the following comments: (1) "it's not a question as to whether or not [the victim] was killed or that the death was absolutely tragically horrific . . . ." and (2) "the prejudicial value of the condition of that body may be so horrific for some folks that it might influence your verdict in this case and that's why those photographs have not been admitted and the court would not allow those photographs to be admitted." The trial court made these remarks in addition to the agreed upon procedure at the bench conference. Although the trial court is better advised not to provide an in-depth explanation for denying the jury's request, we fail to see, and Anderson fails to show, how he was prejudiced by the trial court's remarks. See id. Because the trial court's response was legally correct, Anderson is not entitled to relief.

**III. Offer of Proof.** Anderson next claims that "the [trial] court erred in denying [him] an opportunity to make an offer of proof regarding the truthfulness of [Sergeant Maness'] testimony." Anderson specifically contends that he should have been permitted to make an offer of proof in order to refresh Sergeant Maness' recollection of his involvement

in the investigation of the case.[1]  In response, the State contends that Anderson's reliance on Rule 608 is misplaced and that the trial court properly limited defense counsel's cross-examination of Sergeant Maness.

Rule 608(b) of the Tennessee Rules of Evidence governs the admissibility of a witness's prior conduct for impeachment.  Under Rule 608(b), a witness may be impeached using specific instances of conduct during cross-examination if the conduct is probative of the witness's character for truthfulness or untruthfulness.  Tenn. R. Evid. 608(b).  "If the witness denies the conduct, the party proffering the evidence must be satisfied with that response and may not seek to prove the conduct by extrinsic evidence." State v. Wyrick, 62 S.W.3d 751, 780 (Tenn. Crim. App. 2001) (citing Tenn. R. Evid. 608(b)), perm. to appeal denied (Tenn. July 12, 2001).

On the other hand, Rule 612 of the Tennessee Rules of Evidence, which governs this issue, permits a witness to use a writing while testifying to refresh his or her memory under certain circumstances. The procedure for refreshing a witness's recollection is outlined in the Advisory Commission Comments to Rule 612, which state:

> Only if a witness's memory requires refreshing should a writing be used by the witness.  The direct examiner should lay a foundation for necessity, show the witness the writing, take back the writing, and ask the witness to testify from refreshed memory.

Tenn. R. Evid. 612, Advisory Comm'n Comment.  In addition, this Court has previously stated that "Rule 612 does not limit the type of writing that may be used to refresh a testifying witness's recollection[.]" Moreover, the preparer or author of the writing is irrelevant:

> Rule 612 applies to a "writing."  It does not prescribe who must author the writing or the source of the writing.  Rule 612 applies to any writing used to refresh a witness's memory, irrespective of who prepared the writing, when it was prepared, or whether the witness had ever seen the writing until the moment of testimony.  The writing used to refresh memory need not be admissible and the best evidence rule, Rule 1002, is inapplicable.

---

[1] In Anderson's brief, he claims the trial court should have permitted the offer of proof based upon Rule 608(b)(1) of the Tennessee Rules of Criminal Procedure.  We presume, as did the State, that Anderson relies upon Rule 608(b)(1) of the Tennessee Rules of Evidence.

State v. Price, 46 S.W.3d 785, 813-14 (Tenn. Crim. App. 2000) (quoting Neil P. Cohen, et al., Tennessee Law of Evidence § 612.2, at 402 (3d ed. 1995)), perm. to appeal denied (Tenn. Feb. 26, 2001).

During cross-examination, defense counsel asked Sergeant Maness (1) whether he spoke to Roy Stevenson, whom counsel alleged to be the victim's boyfriend, and (2) whether Sergeant Maness went to a certain beauty shop as part of his investigation. Sergeant Maness responded that he either did not speak to or could not recall speaking to Roy Stevenson. He also said he did not recall going to the beauty shop but explained that he was in the same area as the beauty shop looking for the subject vehicle. The following pertinent exchange also occurred:

DEFENSE COUNSEL: Can you review that document please, sir.

SERGEANT MANESS: This supplement was written by Sergeant Mason.

STATE: I think that's important, Judge, if he's asking him if it's his supplement.

THE COURT: [Defense Counsel], it is not proper for this witness to review a supplement that he did not prepare and he cannot testify about any supplement that someone else might have prepared.

DEFENSE COUNSEL: That's - I don't think that was my question, Judge. I was trying to ask him whether or not if that - is that a supplement, sir, that would normally be prepared as part of the investigation - -

STATE: Relevance, Your Honor.

THE COURT: [Defense Counsel], you're asking him to review another witness['s] supplement. He does not have any personal knowledge of that supplement. It's not appropriate or proper to have another witness look at a document that may have been submitted or created by another person.

DEFENSE COUNSEL: Well, unless he's going to testify and accurately that he wasn't with the writer –

STATE: Objection, Your Honor.

THE COURT: [Defense Counsel], [Defense Counsel], I've ruled. Do not make jury arguments. Do not argue with the Court in front of this jury. This

-15-

document is not admissible. You may not question this witness off of someone else's supplement. It is inappropriate. If you want to call somebody else for possible impeachment, call the appropriate person. I will not allow you to have someone else look at another person's document and try to impeach this witness off something someone else may have prepared. This Court will sustain the objection. Please do not argue with this Court in front of the jury. Pass that back to [defense counsel], please.

DEFENSE COUNSEL: May we approach briefly, please?

THE COURT: No, sir. You may ask your questions and continue your examination.

This issue is complicated by counsel's confusion of Rules 608 and 612. At one point in the cross-examination, the record clearly shows that counsel intended to impeach Sergeant Maness with another officer's supplement. In this regard, the trial court properly limited defense counsel's cross-examination of Sergeant Maness and Anderson is without relief. However, in so much as defense counsel attempted to refresh Sergeant Maness' recollection, this was not prohibited by Rule 612; therefore, it was error for the trial court not to allow Sergeant Maness to review the supplemental report to determine if he could refresh his recollection from it. However, when a defendant's opportunity for effective cross-examination is denied, the error may be harmless under the rule of Chapman v. California, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967), which held that the reviewing court must be satisfied beyond a reasonable doubt that the error did not contribute to the defendant's conviction. In Van Arsdall, the United States Supreme Court held that certain factors should be considered when determining whether an error is harmless:

> These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438 (1986).

Upon consideration of the above factors, we conclude that the trial court's error was harmless. The record shows that defense counsel was permitted to make an offer of proof at the conclusion of Sergeant Maness' cross-examination. During the offer of proof, Sergeant Maness essentially provided the same responses that he gave during his cross-examination. The record shows the trial court permitted defense counsel to thoroughly question Sergeant Maness. Defense counsel elicited testimony from Sergeant Maness, based

-16-

on the supplemental report, to sufficiently impeach Sergeant Mason. Even though defense counsel commented that he would be calling Sergeant Mason to testify, Sergeant Mason did not testify at trial. In addition, the State's proof, which consisted of two eyewitnesses who observed Anderson driving the vehicle with the victim's body underneath it, was overwhelming. Accordingly, any error in limiting Anderson's ability to cross-examine Sergeant Maness was harmless. Anderson is not entitled to relief on this issue.

Within this section of his brief, Anderson also makes several sweeping assertions without citation to any authorities or the record. He claims that "[Sergeant Maness] was attempting to avoid questions and being outright untruthful" and that "the trial court chastised defense counsel after his request to make an offer of proof [and] just prior to that 'threatened disciplinary action' for requesting a bench conference." "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b). Failure to comply with this basic rule will ordinarily constitute a waiver of the issue. Id.; State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000), perm. to appeal denied (Tenn. Oct. 30, 2000). Waiver notwithstanding, we have determined that Anderson's allegations are not supported by the record. Accordingly, these issues are without merit.

**IV. Court's Comments.** Anderson next contends that "the [trial] court's comments in the presence of the jury unfairly prejudiced the defendant." Here, Anderson claims that the trial court violated "Judicial Cannon 3 (B)(5-9)" by "inject[ing] himself and [making] objections on behalf of the state" and by failing to "require the state [or] the defense to argue the basis of their objections." By doing so, Anderson argues the trial court gave the jury a "potentially biased view toward [him]" because it chastised defense counsel and assisted the State.

When reviewing a claim of bias, "[a]ny comments made by the trial court must be construed in the context of all the facts and circumstances to determine whether a reasonable person would construe those remarks as indicating partiality on the merits of the case." Alley v. State, 882 S.W.2d 810, 821-22 (Tenn. Crim. App. 1994) (citations omitted); Ali v. State, No. E2001-00183-CCA-R3-PC, 2003 WL 1877242, at *11-12 (Tenn. Crim. App., at Knoxville, Apr. 11, 2003), perm. to appeal denied (Tenn. Nov. 3, 2003). An adverse ruling does not necessarily indicate bias or prejudice, and comments reflecting "insensitivity and lack of sympathy on the part of the judge" are insufficient to establish impartiality unless they are pervasive and accompanied by prejudicial conduct. Alley, 882 S.W.2d at 821-22 (citations omitted).

Moreover, it has long been settled that "all litigants are entitled to the 'cold neutrality of an impartial court' and have a right to have their cases heard by fair and impartial judges." Wright v. Pate, 117 S.W.3d 774, 778 (Tenn. Ct. App. 2002) (citations omitted), perm. to

appeal denied (Tenn. May 5, 2003). Cannon 3(B) of the Code of Judicial Conduct observes that a trial judge should be "patient, dignified, and courteous to the litigants, jurors, witnesses, [and] lawyers" during the course of a trial, and instructs the trial judge to perform its judicial duties without bias or prejudice. Tenn. Sup. Ct. R. 10, Canon 3(B)(4), (5). Moreover, "[t]he trial judge must be extremely careful to avoid doing or saying anything that might prejudice the rights of the parties in the case." Pique v. State, 480 S.W.2d 546, 550 (Tenn. Crim. App. 1971), perm. to appeal denied (Tenn. May 1, 1972). Although broad discretion is extended to the trial judge in controlling the course and conduct of the trial, the trial judge must refrain from expressing "any thought that might lead the jury to infer that the judge is in favor of or against the defendant in a criminal trial." State v. Cazes, 875 S.W.2d 253, 260 (Tenn. 1994) (citing State v. Caughron, 855 S.W.2d 526, 536 (Tenn. 1993)); State v. Harris, 839 S.W.2d 54, 66 (Tenn. 1992).

As with most of the issues presented within Anderson's brief, we are tasked with discerning the applicable authority upon which he relies in support of them. Here, he broadly contends that the trial court violated various Judicial Cannons without specifying the particular Judicial Cannon that was violated or stating the way in which the trial court violated it. Further, Anderson fails to specify the relief upon which he seeks. The record shows that Anderson failed to object, move for a mistrial, move for recusal, or otherwise complain at any point during the trial. Regardless of the deficiencies within Anderson's brief, we have reviewed the record in its entirety and conclude that Anderson had the benefit of the "cold neutrality of an impartial court" as contemplated by the Judicial Cannons of Rule 10. See also Wright, 117 S.W.3d at 778. Anderson has failed to show that the trial court acted inappropriately during the trial, and we discern no judicial misconduct. In so much as Anderson argues that the trial court's demeanor and conduct denied him due process of law, we conclude based on our review of the record that the trial court exhibited no judicial bias. Anderson is not entitled to relief on this issue.

**V. Evidentiary Issues.** Anderson claims the trial court abused its discretion by erroneously excluding the following testimony: (A) whether Sergeant Maness' investigation revealed that the victim had a boyfriend other than Anderson, (B) whether the victim was with someone else prior to her death, and (C) whether the officer's investigation revealed that Anderson was at the beauty shop when the crime occurred.

Evidence is considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Evidence which is not determined to be relevant is inadmissible. Tenn. R. Evid. 402. In addition, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative

evidence." Tenn. R. Evid. 403. Whether evidence is relevant is a decision left to the discretion of the trial court, and this court will not will not overturn a trial court's determination regarding relevancy without a showing that the trial court abused its discretion. State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995).

A. **Evidence of Alleged Other Boyfriend.** First, Anderson claims that "he attempted to elicit evidence that someone other than the defendant may have committed the crime." Specifically, he argues the trial court abused its discretion by refusing to allow him to question Sergeant Maness regarding "whether [Sergeant Maness'] investigation revealed that the victim may have had a boyfriend other than the defendant named Roy Stevenson."[2] Unfortunately, because Anderson fails to cite to the record, we presume he refers to the same section of Sergeant Maness' testimony discussed in section III of this opinion.

Following a protracted discussion at the bench, the trial court stated:

[Defense Counsel], it has not been raised by the evidence. It has not been submitted. What you're asking me to do is to speculate and conjecture as to what the jury might be thinking. These questions that you're asking right now (indiscernible whispering) somehow relevant. Under 401 (indiscernible whispering) of any fact that is (indiscernible whispering) determination of. There is nothing probative about whether or not there are other folks who might have (indiscernible whispering). And what I am hearing is that you want the jury to think that somebody else might have done that and there is nothing on the record that would support that proposition. (Indiscernible whispering) allow the jury to speculate as to other folks and include things that other folks might have done. So it's not — I don't see where it's relevant. It's not admissible under 402 unless it is somehow relevant. And under 403 even if it is ["]admissible or relevant,["] it is excluded if the probative value is outweighed by unfair prejudice or confusing the issue or undue delay of time. And I don't see how all – how this is relevant to any issues the jury has. And what you're asking me to do is to allow information on the record that they can go back and speculate about things that have nothing to do with whether or not Mr. Anderson committed this crime.

We conclude that the trial court's exclusion of the testimony regarding Roy Stevenson was not an abuse of discretion. Anderson argues he was attempting to show that someone else committed the instant offense and that the victim had "moved on with someone else and the defendant was no longer associated with the victim." There was absolutely nothing in

---

[2]Throughout the trial as well as in Anderson's brief to this court, defense counsel referred to the victim's alleged boyfriend at the time of her death as "Ray Stephenson" and "Roy Stephenson."

the record to support this conclusion. Furthermore, Sergeant Maness testified in the offer of proof that he did not speak with Roy Stevenson; therefore, his answer to defense counsel's question would not have been relevant. Anderson is not entitled to relief on this issue.

**B. <u>Evidence that Victim was with Someone Else Prior to her Death.</u>** Secondly, Anderson argues the trial court abused its discretion by excluding testimony regarding whether the victim was with someone else prior to her death. Anderson is apparently aggrieved because defense counsel asked Sergeant Mullins if his investigation had revealed the victim's whereabouts on the morning of the murder:

DEFENSE COUNSEL: . . . Didn't you also have information that pursuant to your investigation that in fact Ms. Godwin had been dropped off at the corner of a crack house that morning by another individual?

SERGEANT MULLINS: There was something –

STATE: May we approach, Judge?

(Bench Conference was held.)

THE STATE: I want to renew the objection I made earlier today about them attempting to bring in back door evidence of other suspects in this case. And I would also object to the characterization of [defense counsel] in front of the jury of the crack house.

. . . .

THE COURT: So this is a hearsay statement by a witness that you want this officer to verify?

DEFENSE COUNSEL: No. This is not – it's not offered for the truth of the matter asserted. He was investigating the whereabouts of this woman, who was the last person who could of had contact with her. Pursuant to the investigation they learned that another individual had dropped this woman off at a crack house which is what that supplement says, the way that supplement says at a crack house the morning right before –

THE COURT: You want –

-20-

DEFENSE COUNSEL: – [T]hat individual, who – the individual who was alleged to have dropped her off at that crack house. They went out pursuant to that information and went out and did a full interview with that individual.

THE COURT: [Defense counsel], if you're going to ask any information about whether or not he had information as to where this woman may have been before she was killed, that's fine. But to ask him specific question about statements about what somebody told him is hearsay. It is a third party statement. It is being offered for the truth of the matter asserted especially when you (indiscernible whispering) something as

DEFENSE COUNSEL: (indiscernible).

THE COURT: – [D]on't interrupt when I'm speaking – offering characterization of something as a crack house. That's assuming facts that are not in evidence. You're asking this witness to adopt those statements from a third person and that is hearsay. If you want to ask him about this investigation or information as to where Ms. Godwin might have been located before she was killed, that would be relevant as to show who – that she might have been somewhere else, with someone else. But these characterizations that you're asking him to adopt is assuming facts not in evidence. It is hearsay and the Court will sustain the objection.

DEFENSE COUNSEL: I'll rephrase the question.

Anderson offers a single sentence in support of his claim "that this information directly conflicted with the other evidence that the officers had collected, but nevertheless failed to follow up on." Anderson fails to articulate in what way the trial court abused its discretion. The record shows that once cross-examination resumed, Sergeant Mullins testified that he could not remember whether his investigation revealed the victim's whereabouts or whether the victim had been with someone else on the day of the offense. We conclude that the trial court did not abuse its discretion in regard to Sergeant Mullins' testimony. Anderson is not entitled to relief on this issue.

**C. Evidence that Anderson was at the Beauty Shop at the Time of the Offense.**
Finally, Anderson argues the trial court "denied the defendant an opportunity to elicit testimony that the officer's investigation revealed that the defendant was at the beauty shop when the crime occurred[.]" Anderson points to the following testimony during Sergeant Maness' cross-examination in support of this issue:

DEFENSE COUNSEL: So at what point did you leave? Did you leave right after the little statement he made, is that when you left[?]

SERGEANT MANESS: I talked to the other man that was there. He said he'd been with him that afternoon.

DEFENSE COUNSEL: In fact that other man that you said had left in fact told you that he was the one who went to pick [Anderson] up from the beauty shop, didn't –

STATE: Objection, Your honor, hearsay.

THE COURT: The Court will sustain the objection as to hearsay as to any other conversation that some other unknown person may have made to this witness[.]

DEFENSE COUNSEL: Didn't you investigate, Officer Maness, the individual who you saw get up and try to walk away? You detained him, didn't you?

SERGEANT MANESS: I talked to him.

DEFENSE COUNSEL: Right for the purpose of investigating this case, weren't you?

SERGEANT MANESS: Yes, sir.

DEFENSE COUNSEL: And pursuant to your investigation, you determined – you determined that [he] was the individual who brought Mr. Anderson back from the beauty shop, didn't you?

SERGEANT MANESS: That's what he said.

DEFENSE COUNSEL: And that's exactly what Mr. Anderson said; isn't that correct?

STATE: Objection, Your Honor.

DEFENSE COUNSEL: That was solicited by the State on direct.

STATE: It's a party opponent.

DEFENSE COUNSEL: Mr. Anderson is a party opponent. That's my point. I said that's exactly what Mr. Anderson told him. He's a party opponent.

THE COURT: [Defense counsel], any statements that Mr. Anderson might have made that are against his penal interest or possibly against his penal interest as a party opponent would be admissible as an exception to hearsay but any other statements that may have been made by Mr. Anderson that are not against his penal interest are improper bolstering statements and the Court will sustain the objection.

As noted by the State, Anderson fails to provide any argument in support of this issue or state in what way the trial court abused its discretion. Therefore, this issue is waived. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); Tenn. R. App. P. 27(a)(7) (The brief shall contain "[a]n argument . . . setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on."). Waiver notwithstanding, we conclude the trial court properly sustained the State's objection. Based on the above exchange, the record shows that Sergeant Maness spoke with an individual who stated that he was with Anderson on the day of the offense. Defense counsel then attempted to elicit specific statements made by this individual through Sergeant Maness, which the trial court properly determined to be inadmissible hearsay. In so much as Anderson attempted to elicit from Sergeant Maness that Anderson told him that another individual had brought him back from the beauty shop, we further conclude that the trial court did not abuse its discretion. Anderson is not entitled to relief on this issue.

**VI. State's Alleged Improper Conduct.** Anderson argues that he was unfairly prejudiced by the improper conduct of the State. Specifically, he argues that the State failed to provide the following: photographic and descriptive information regarding another individual who was also named "Big Bundy"; exculpatory statements and contact information of Roy Stevenson, Marcus Collins, and Bernard Brown; and impeachment evidence pertaining to his own alibi witness. Anderson further claims that the State improperly coerced a potential defense witness into cooperating with the State by giving him consideration on his pending cases in exchange for his testimony. The State contends that there was no improper conduct on the part of the prosecution in this case.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and the "Law of the Land" Clause of Article I, section 8 of the Tennessee Constitution afford all criminal defendants the right to a fair trial. The United States Supreme Court in Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963), held

that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of good faith or bad faith of the prosecution." Evidence that is "favorable to an accused" includes both "evidence deemed to be exculpatory in nature and evidence that could be used to impeach the state's witnesses." Johnson v. State, 38 S.W.3d 52, 55-56 (Tenn. 2001). Favorable evidence has also been defined as the following:

> [E]vidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness.

Id. at 56-57 (quoting Commonwealth v. Ellison, 376 Mass. 1, 379 N.E.2d 560, 571 (1978)). "The duty to disclose exculpatory evidence extends to all 'favorable information' irrespective of whether the evidence is admissible at trial." State v. Robinson, 146 S.W.3d 469, 512 (Tenn. 2004) (citing Johnson v. State, 38 S.W.3d at 56).

Evidence is considered material under this standard only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 433, 115 S. Ct. 1555, 1565 (1995) (citation omitted); State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995). The United States Supreme Court held:

> [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

Kyles, 514 U.S. at 434, 115 S. Ct. at 1566 (quoting United States v. Bagley, 473 U.S. 667, 678, 105 S. Ct. 3375, 3381 (1985)). Both impeachment evidence and exculpatory evidence fall within the Brady rule. Bagley, 473 U.S. at 676, 105 S. Ct. at 3380. The burden of proving a Brady violation rests with the defendant, and the violation must be proved by a preponderance of the evidence. Edgin, 902 S.W.2d at 389 (citing State v. Spurlock, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993)).

In order to establish a Brady violation, the defendant must show the existence of four elements: (1) that the defendant requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not); (2) that the State withheld the information; (3) that the withheld information was

-24-

favorable; and (4) that the withheld information was material.  State v. Edgin, 902 S.W.2d at 389 (citations omitted).

**A.  Photographic and Descriptive Information.**  In regard to the photographic and descriptive information regarding the other individual who also had the nickname "Big Bundy," the record shows that this individual did not match the description provided by the eyewitnesses to the offense.  Additionally, in light of the testimony from two eyewitnesses who identified Anderson as the driver of the vehicle and saw him dragging the victim's body underneath, we fail to see, and Anderson fails to provide, any argument in support of how a photograph or a description of the other individual would be exculpatory.

**B.  Alleged Exculpatory Statements.**  Next, Anderson contends that the State failed to provide exculpatory statements from or contact information for Roy Stevenson, Marcus Collins, and Bernard Brown.  In support of this argument, Anderson states that these individuals "gave favorable or exculpatory information regarding the defendant" based on "exhibit B."  Here, we must note that Anderson attached to his brief seven documents entitled "exhibits A-F" which were not admitted at trial.  This court has repeatedly held that documents attached to appellate briefs which were not admitted to the trial court do not constitute evidence introduced to and admitted by the trial court.  See Tenn. R. App. P. 24(g); Grover L. Dunigan v. State, No. E2005-01574-CCA-R3-PC, 2006 WL 433699, at *3 (Tenn. Crim. App., at Nashville,  at Knoxville, Feb. 23, 2006), perm. to appeal denied (Tenn. June 26, 2006) (stating that "documents attached to an appellate brief but not included in the record on appeal cannot be considered by this court as part of the record on appeal"); Billy Noble Forrest v. John Rees, Warden, No. 01C01-9411-CC-00387, 1996 WL 571765, at *3 (Tenn. Crim. App., at Nashville, Oct. 8, 1996) (stating that "attachments to briefs are not evidence and will not be considered by the appellate courts"), perm. to appeal denied (Tenn. Jan. 27, 1997).  Thus, we will not consider those attachments as "exhibits."

Even so, "exhibit B" appears to be the supplemental report that Anderson attempted to use to impeach Sergeant Maness.  Anderson clearly had possession of this document at trial.  Moreover, Anderson fails to provide any argument regarding how the information contained within "exhibit B" is exculpatory.  We therefore conclude that the State did not engage in any misconduct.

**C.  Statement of Georgia Scruggs.**  Anderson further claims that the State engaged in misconduct because he was not provided with the statement of Georgia Scruggs, his alibi witness, prior to trial.  The record shows that the defense called Georgia Scruggs, Anderson's mother, to testify regarding Anderson's whereabouts on the day of the offense.  Following her direct testimony, the State impeached her on cross-examination based on a prior statement that she had provided to law enforcement.  After the cross-examination was concluded, and at a bench conference, defense counsel apparently asked to review the

statement, arguing that he was entitled to it "under the discovery rules" and that it was "exculpatory." The trial court explained that defense counsel would only be entitled to review Georgia Scruggs statement under Rule 613, which governs prior inconsistent statements. It further directed the State to provide the statement to defense counsel because it was used for impeachment purposes. The trial court applied the same reasoning in denying this issue at the motion for new trial.

Here, as explained by the trial court, defense counsel misinterprets the import of Tennessee Rule of Criminal Procedure 16. Rule 16(a)(2), which deals with information not subject to disclosure to the defendant, excludes from discovery "statements made by state witnesses or prospective state witnesses." Tenn. R. Crim. P. 16(a)(2). Based on the record, Georgia Scruggs was a prospective state witness. However, the defense, not the State, ultimately called Georgia Scruggs as an alibi witness. The impeachment evidence which developed as a result did not exist until after Georgia Scruggs provided her direct testimony. As noted by the trial court, Rule 613 of the Tennessee Rules of Evidence governs prior statements of witnesses and provides, in pertinent part, when "examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel." Tenn. R. Evid. 613(a). The trial court properly directed the State to allow defense counsel to review the statement upon his request under Rule 613. Anderson is not entitled to relief on this issue.

**D. Alleged Coercion of a Witness.** Anderson also alleges that the State improperly coerced a potential defense witness into cooperating with the State by giving him consideration on his pending cases in exchange for his testimony. Here, Anderson claims that he had obtained an affidavit from Mario Smith, an individual who had initially stated that Anderson was not at the crime scene on the day of the offense. Apparently, though not borne out in any way by the record, Anderson alleges Mario Smith changed his statement after consulting with the State and was not called as a defense witness. Anderson did not present any proof at the motion for new trial hearing on this issue. He did, however, present Mario Smith's affidavit, which was admitted as an exhibit to the hearing. The handwritten affidavit provides:

> On June 29, 2006, I Mario Smith, was on the seen [sic] of Grand on the day of June 29, the day the murder happen[ed] and the Guy that they said did the murder I was locked up with him and that was not the same person that I seen did [sic] the crime.

In denying this issue, the trial court stated:

The state has indicated that they had no promises, had no agreements, had no Brady information, and what the Court has in front of him is speculation that Mr. Smith gave a statement; started to recant his statement, which happens all the time. Witnesses do that all the time.

And as a result of that, [defense counsel] says maybe the state made a deal with him. Maybe the state set his case – after this case was tried, he pled guilty to certain things, and maybe the state had a deal cut with him and therefore it's wrong. That is one speculation. They have absolutely no proof that would indicate that any of that happened, and the Court will deny that [issue].

The trial court properly denied Anderson relief on this issue. Nothing in the record demonstrates that the State engaged in misconduct regarding Mario Smith. Anderson is not entitled to relief on this issue.

**VII. Qualification of Expert.** Anderson argues that "the trial court erred in qualifying Sergeant White as an expert and admitting his conclusions." Specifically, Anderson claims the trial court abused its discretion because Sergeant White did not have the requisite training to be qualified as an expert in the field of traffic investigation and accident reconstruction.

"Questions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court." State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002) (citing McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 263-64 (Tenn. 1997); State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993)). Upon review, a trial court's ruling regarding expert testimony will not be overruled unless the trial court abused its discretion. Ballard, 855 S.W.2d at 562 (citing Baggett v. State, 421 S.W.2d 629, 632 (Tenn. 1967)). Under this standard, we will not reverse unless the "'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

Rule 702 of the Tennessee Rules of Evidence provides: "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." The witness's necessary expertise may acquired through formal education or life experiences. Neil P. Cohen et al., Tennessee Law of Evidence § 7.02[4] at 7-21. However, the witness must possess such superior skill, experience, training, education, or knowledge within the

particular area that his or her degree of expertise exceeds the scope of common knowledge and experience possessed by the average person. Id. (citations omitted).

The record shows that Sergeant White had been employed with the Memphis Police Department for twenty-nine years. He had been with the Special Traffic Enforcement Investigation Division, which handled accidents involving fatal injuries or critical injuries that may become fatal, squad car accidents or fire, and anything involving a motorized vehicle, for six years. In regard to special training, Sergeant White had been to three or four different schools on railroad accidents. He attended Basic Traffic Investigation, Advanced Traffic Investigation and Accident Reconstruction, all classes taught by "I.P.T.M. in North Florida University, who brings their instructors to Memphis." He also attended a one-week session each year of in-service training. As a lead investigator, Sergeant White testified that he had handled between 40 and 50 traffic investigations. As a secondary investigator, he handled close to 200 investigations. Sergeant White had been previously declared as an expert in the area of special traffic investigations in State court. The defense objected to these qualifications, and cross-examined Sergeant White.

After cross-examining Sergeant White, defense counsel objected and stated that Sergeant White was not "published in that field and . . . he seems to have taken a localized class. I don't think he's recognized in the industry as an expert either locally or nationally. I'm not sure beyond the fact that he's an experienced Crime Scene officer that he has any particular expertise in recreating accidents."

After further questioning by the trial court, the trial court noted defense counsel's objection and qualified Sergeant White as an expert in the field of traffic investigation and accident reconstruction. The trial court stated that Sergeant White had previously been qualified in court to testify as an expert and that the law did not require Sergeant White to have taught or published any material in that area to be qualified as an expert.

Here, Anderson specifically contends that Sergeant White should not have been permitted to testify as an expert or to provide an opinion in the area of accident reconstruction because he had no formal certifications and was unsure of his last "refresher course" or of the type of vehicle used in the offense. Anderson further argues that Sergeant White did not view the vehicle that was initially recovered and believed to have been used in the instant case and had no legitimate scientific methodology to form a basis for his opinion. We disagree. We initially note that, other than providing the point of impact or "origination," this record does not establish that Sergeant White provided an opinion regarding how this offense occurred. Additionally, this court has repeatedly rejected challenges to officers offered as experts in the area of accident reconstruction with similar backgrounds. State v. David L. Davis, No. 324, 1990 WL 198161, at *2 (Tenn. Crim. App., at Knoxville, Dec. 10, 1990) (rejected challenge to officer offered as expert in accident

reconstruction based on lack of qualifications); <u>State v. Robert L. Turner</u>, No. 321, 1991 WL 10181, at *4 (Tenn. Crim. App., at Knoxville, Feb. 4, 1991) (rejected challenge to officer offered as an expert in accident reconstruction because "little, if any, [scientific] expertise" was involved because officer was offered to provide an opinion as to the area of impact based exclusively on his observation of the physical evidence at the scene and the conclusions drawn therefrom), <u>perm. to appeal denied</u> (Tenn. July 1, 1991). We therefore conclude that the trial court did not abuse its discretion in ruling that Sergeant White was competent to render expert testimony in the instant case. Accordingly, Anderson is not entitled to relief on this issue.

**VIII.   Failure to Instruct the Jury on the State's Duty to Preserve Evidence.** Anderson argues the trial court erred in failing to give an instruction on the "duty to preserve evidence." He claims the trial court refused to allow the special jury instruction without conducting the requisite inquiry. In response, the State argues the trial court properly refused to issue a jury instruction on the State's duty to preserve evidence.

<u>State v. Ferguson</u> governs claims regarding the State's duty to preserve potentially exculpatory evidence. 2 S.W.3d 912 (Tenn. 1999). "Generally speaking, the State has a duty to preserve all evidence subject to discovery and inspection under Tennessee Rule of Criminal Procedure 16, or other applicable law." <u>Id.</u> at 917 (internal footnote omitted). The analysis under <u>Ferguson</u> is only triggered, however, if the alleged exculpatory evidence is determined to be material. <u>Id.</u> To be material, the "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." <u>Id.</u> Once the court determines that the evidence is material and the State failed in its duty to preserve the evidence, <u>Ferguson</u> requires the trial court to consider the following factors which bear upon the consequences of the State's breach of its duty: (1) the degree of negligence involved, (2) the significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available, and (3) the sufficiency of the other evidence used at trial to support the conviction." <u>Id.</u> (internal footnote omitted).

In denying Anderson's request, the trial court applied <u>Ferguson</u>:

Yes, Sir. The Court believes that the State of Tennessee did not have a duty to preserve that automobile. The testimony in this trial from Sergeant Mullins is that they conducted an investigation of that car that was found. His testimony was that the car had been abandoned, had broken down on the highway several days before it could of possible been used in a homicide. That that vehicle showed no indication of any damage, any blood, anything that would indicate that the car had in fact been used in a homicide. That the vehicle was towed. That they did a cursory visual examination of that car and

found nothing that would indicate that that car had any evidentiary value. And that if they felt it would [have had any evidentiary value] they would [have] run some additional tests on that car.

The Court finds that Sergeant Mullins is a homicide detective who's been investigating homicides for a number of years and he made a decision that – and he is a qualified person, they made a decision that that car did not have any exculpatory value. That the car had been reported by the owner of the car as having a flat tire several days before this incident and that the car was sitting on a flat tire and I believe indicated on a wheel or on a rim and as a result of that they concluded that the car could not have been used in this homicide.

So the Court finds that the State of Tennessee did not have a duty to preserve a car that by all reasonable indications could not have been used as an instrument in the commission of this crime. In order for the Court to charge that particular charge, the Court has to find that the State of Tennessee was in fact negligent in not preserving that car and that the State acted in bad faith. The Court also has to make a decision as to whether or not that evidence, that car that was not preserved, had some probative value considered in the light of all the other substantive evidence that may have been presented at this trial. And, [t]hirdly, the Court has to conclude that the car which was not preserved somehow fundamentally deprived Mr. Anderson of a fair trial in this case.

And Mr. Anderson's defense and his theory of this case has been all along is that he did not commit this crime. That he was at some other location at the time that this offense was committed and, therefore, he could not have committed this crime. This Court finds beyond any doubt that the car that belonged to another person had broken down and been abandoned. It was still in the same location at which the owner of this car had abandoned the car several days before this killing.

This Court finds that there is absolutely no exculpatory value in that car. This Court finds that Sergeant Mullins acted properly when he towed and inspected that car and release it back to the owner. This Court finds the State of Tennessee was neither negligent or acted in bad faith when that car was given back to the owner. The Court finds that automobile is not material to the preparation of the defendant's defense. That defense being I could not have committed this crime because I was at another location.

-30-

Upon our review of the record, we conclude that the trial court properly refused to instruct the jury on the State's duty to preserve the automobile. In support of his motion, defense counsel further argued:

[Sergeant Mullins] indicated there was no scientific or other type of testing done, fingerprints or otherwise on this vehicle other than a cursory inspection. And so to that extent, I think it does put Mr. Anderson in a perilous position where he's having to rely on the State to preserve that particular piece of evidence and rather than hold the car for the purposes of – or just doing a full inspection themsel[ves]. Had they had a forensic report from TBI and some fingerprints that said that this – there [were] no fingerprints found here but the owners or the owner[']s family members. And we did – we did – if TBI did an examination of this car and there's no blood evidence found, I think I couldn't make this argument at all. But the problem is they did a cursory [examination].

The trial court rejected counsel's argument by applying the aforementioned reasoning.

We agree with the trial court. Here, Anderson's argument amounts to no more than speculation that the vehicle recovered by the officers would have in some way yielded exculpatory evidence had it been subject to forensic analysis and testing. We have previously stated that "the mere possibility of exculpatory content does not trigger a finding that the State failed in its general duty to preserve evidence under Ferguson." State v. Ronnie D. Sims, No. M2004-02491-CCA- R3-CD, 2005 WL 3132441 at *8, (Tenn. Crim. App., at Nashville, Sept. 21, 2005) (citing State v. Coulter, 67 S.W.3d 3, 54-55 (Tenn. Crim. App. 2001), perm. to appeal denied (Tenn. Oct. 29, 2001)), perm. to appeal denied (Tenn. March 20, 2006). In regard to the second materiality prong, that the alleged exculpatory evidence be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonable available means, Anderson has failed to show that he was unable to obtain evidence regarding the vehicle by other means. The vehicle in question here was returned to the owner, not lost or destroyed. Nothing in this record shows that Anderson would have been prevented from making arrangements to inspect it. The record supports the trial court's finding that the vehicle was not exculpatory; therefore, it is not necessary to engage in any further analysis under Ferguson. Anderson is not entitled to relief on this issue.

**CONCLUSION**

We conclude that the evidence is sufficient to support Anderson's conviction. We further conclude that the trial court did not err in giving a description of photographs that were not in evidence in response to a jury question, that the trial court's comments were not unfairly prejudicial, that the trial court did not err in denying Anderson an opportunity to

make an offer of proof regarding the truthfulness of an officer's testimony, that the trial court did not err in excluding certain evidence, that Anderson was not unfairly prejudiced by the conduct of the State, that the trial court did not err in qualifying an expert and admitting his conclusions, and that the trial court did not err in failing to instruct the jury on the State's duty to preserve evidence. Upon review, we affirm the judgment of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE